IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BOBBY DOMINGUEZ,

        Plaintiff,

v.                                                     CIV 02-931 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

## **MEMORANDUM OPINION AND ORDER**

      Plaintiff Bobby Dominguez completed most of high school and took two college classes in structural welding. *See Administrative Record* ("*Record*") at 138, 145-150, 268. He worked in construction from age eighteen for twenty years, performing heavy work primarily as a welder and ironworker. *See id.* at 20, 33, 133, 145-150, 165, 265-66. Administrative Law Judge ("ALJ") Gary L. Vanderhoof found that Plaintiff has the residual functional capacity to perform a significant range of sedentary work. With the assistance of a vocational expert and Medical-Vocational Rule 201.28 as a framework, the ALJ found the thirty-nine year old Plaintiff not disabled at Step 5 of the sequential analysis. *See id.* at 17, 20-21. The Appeals Council declined review on May 30, 2002, thereby rendering the ALJ's decision final. *See id.* at 86, 19-20.

      This matter is before the Court on Plaintiff's Motion to Reverse or Remand, where he asserts that the ALJ committed several errors. *See Docs. 8, 9.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. The entire record has been read and carefully considered, I find that

Plaintiff's motion should be denied and the decision of the Commissioner affirmed.

## I. Factual & Procedural Background

In October 1998, Plaintiff saw Dr. Marshal Baca for pain in his right hip, which was radiating down the leg, and became worse with sitting or pressure to the area. X-rays revealed "some sclerosis of the hip joint with mild joint space narrowing. No avascular changes . . . . The lower lumbar vertebrae were well visualized and there was no apparent disc space narrowing." *Record* at 188. Dr. Baca assessed him Plaintiff with "[p]ossible early DJD (degenerative joint disease), right hip," and recommended that Plaintiff stretch and take the anti-inflammatory medication Daypro. *Id.; see also* 227. A week and a half later, with Dr. Baca's authorization, Plaintiff stopped taking the Daypro because it was making him anxious. *Id.* at 188.

On December 2, 1998, Dr. Baca saw Plaintiff for complaints of wrist pain, and he recommended that Plaintiff continue with a different anti-inflammatory medication, Relafen. *Id.* at 189. Two weeks later the wrist pain continued despite the medication, and the results of a bone scan showed abnormalities. Dr. Baca recommended the continued use of the medication and a wrist splint and directed Plaintiff to return in one month. *Id.* at 189. Dominguez did not show up for the appointment, and Dr. Baca's office sent a note. *Id.* at 189. Plaintiff's resume shows that he continued working as a welder during this time. *Id.* at 265.

On April 1, 1999, Plaintiff was laid off of work for reasons not specified in the record. *See id.* at 132, 172, 265. While he was unemployed, Dr. Baca referred Plaintiff to orthopedic and hand clinic doctors at Lovelace Health Systems for Plaintiff's "intermittent complaints" of "several years" of wrist "pain with pronating and supinating movements, particularly with torquing movement," and other movements he utilizes when working. *Id* at 172-74.

2

Although Plaintiff had "full pronation and supination, flexion and extension, and radial and ulnar deviation," as before, the x-rays or his wrist were "unusual," showing either chronic fractures in both wrists, which Plaintiff denied, or a congenital abnormality. *See id.* at 173-74. Dr. William G. Loutfy believed Plaintiff was "starting to develop some DJD changes, particularly on the left side." *Id.* at 173.  Dr. Jeffrie Felter believed Plaintiff had "a congenital thing that started to get enough arthritis in it that it would cause him discomfort." *Id.* at 174.  Both Dr. Loufty and Dr. Felter wanted to consult with hand surgeons Dr. McGinty and Dr. Teresa Balcomb. *See id.* at 173, 174.

On June 2, 1999, while Plaintiff was still unemployed, Dr. Balcomb examined him for his complaints of wrist pain, "locking," "popping," and weakness that caused him to drop things. Plaintiff was "beginning to be concerned about the consistency of his work [and] feels that he has gotten sloppy" because of his wrist problems. *Id.* at 169.  X-rays revealed that certain bones in his wrists were not properly aligned, appearing to have fractures, and also that Plaintiff was developing arthritis.[1]  Her examination revealed that Plaintiff

---

[1] She reported that:

> X-rays on the right side show a scaphoid non-union with radiocarpal arthritis, some early collapsing deformity of the lunate, it appears, with a fixed rotatory DISI of the lunate.  Also, the surface of the radius does not appear to be congruent, and looking at it on the lateral, it almost seems as though there is an interarticular fracture of the distal radius with a step-off in the joint.  The mid-carpal joint also appears to be involved with some thinning of the joint space between the capitate and lunate.  On the lateral, there is large dorsal bossing, somewhere around the mid-carpal joint; I can't be specific about exactly where it is.
>
> The left side shows a very proximal scaphoid non-union with an almost obvious articular surface between the two bones, as though there are nine bones in the wrist instead of eight.  There is very early radiocarpal beaking on the radial styloid, but a well-preserved mid-carpal joint, and

> has 55E of palmar flexion and 60E of dorsiflexion on the right, and an equal amount on the left. On the right side, he has a positive scaphoid shift test, and he tenses up a lot, and doesn't allow good range of motion, however, with circumduction, there is a fair amount of grinding and pain. He has a very prominent carpal boss, but no swelling proximal to that. He has no pain at the base of his thumb. He has no pain in the radioulnar joint. Pronation and supination are not painful, and he has a negative lunate ballottement. His pulses are normal on this side. He has full extension and flexion of his fingers.

*Id.* at 170.

Dr. Balcomb spent most of the office visit counseling Plaintiff. In her opinion, the problems with his wrists pose " a monumental problem," a "prescription for disaster," *id.* at 170 and "significantly disabling injuries," *id.* at 171, for Plaintiff in terms of the heavy lifting required by his present occupation, *id.* at 170. Her plan suggested different surgical options, all of which would "require [Plaintiff] to be off work and disabled for a significant period of time." *Id.* at 171. Therefore, she counseled Plaintiff "to take plenty of time to think about his options" consider life-style changes, and try and get by without any surgery until and unless he gets significantly worse." *Id.* at 171. The lifestyle changes she discussed with him were "more education, or ***try to find work that isn't so heavy.***" *Id.* at 171 (emphasis added).

Dominguez first applied for benefits on June17, 1999, alleging that he became disabled on the date he was laid off of work, April 1, 1999. *Id.* at 17, 113-15, 132. 246-48. His disability report indicated that he was "born with bone in both wrists's that is in two pieces, worn out knee, chronic arthritis in right hip, left knee & left elbow." *Id.* at 132. The interviewer at the field

---

lunate fossa of the radius.

*Id.* at 170.

office observed that Plaintiff had difficulty with sitting, standing, walking, using his hands and writing, apparently partly based on her own observations and partly based on what Plaintiff told her. The interviewer indicated that "claimant has trouble sitting down in chair. His hands and knees appear swollen. He has trouble holding pen as his hand is swollen & cannot use his hands to hold any tools to work. Arthritis in knees make it hard to stand or walk for long periods." *Id.* at 143. In the report, Plaintiff asserted that he worked until he "was told by Dr. Baca, Dr. Balcomb not to do so," *id.* at 132, although nothing in their records indicates that they advised him to stop working altogether.

After he filed his first application, Plaintiff underwent left knee surgery on June 29, 1999 by Dr. Baca. Fifteen years earlier, Plaintiff had a "lateral meniscectomy" on the same knee to repair damage caused by a motorcycle accident. *See id.* at 179, 181, 199. He also previously had arthroscopy on his right knee with "marked improvement," so when his left knee began to bother him more frequently with "popping," and "joint line pain," he elected to have Dr. Baca the same surgery on it as well. *Id* at 177-79, 181.

Plaintiff filed a daily activities report ten days after he had his knee surgery, and some of his daily activities were qualified because he was still recovering from that surgery. *Id.* at 151-56. His mother and girlfriend were assisting him with his household and personal needs at that time. *Id.* at 152. He also stated that he "used to hunt and fish but I don't any more, as much as I liked to." *Id.* at 153. A few days after he filed his report, Plaintiff saw Dr. Baca for a follow-up visit. Although Dr. Baca believed the surgery would give Plaintiff "some transient pain relief," he believed Dominguez "will have persistent problems with the knee," noting that his "work as a welder involves quite a bit of squatting." *Id.* at 176. Dr. Baca wanted Plaintiff to "work on

rehabilitating the knee" and return in one month, at which time Dr. Baca "anticipate[d] that [Dominguez] should be able to return to work." *Id.* at 176. Plaintiff did not show up for the appointment the following month and failed to reschedule an appointment. *Id.* at 176.

Instead, two weeks after his follow-up visit with Dr. Baca, Plaintiff moved to Albuquerque and began working as a carpenter as of August 1, 1999. *See id.* at 265. He continued working there for four months until November 30, 1999. The reasons for leaving that position do not appear of record although Plaintiff apparently moved back to Carlsbad. In the interim, the Administration had denied benefits in September on the ground that Plaintiff could perform light work, and Plaintiff filed a request for reconsideration in October. *See id.* at 157-60, 191-98, 249.

Two weeks after Plaintiff left the carpenter job, he was seen by examining consulting physician Dr. S. Sengupta at the Family Practice Center in Carlsbad. *Id.* at 199. Plaintiff evidently reported to Dr. Sengupta that he had been unemployed for six months although he had in fact left the four-month carpenter position just two weeks prior. *See id.* at 199, 265. Dr. Sengupta's examination revealed that Plaintiff could not stand on his left leg, that his left knee joint was "slightly tender [with] slightly diminished ROM as compared to the right knee." *Id.* at 200; *see also id.* at 203. As for Plaintiff's wrists, Dr. Sengupta found

> dorsiflexion 60 degrees on the right and 55 degrees on the left and palmar lexion 55 degrees on both sides. Radial deviation 15 degrees on both sides and ulnar deviation 20 degrees on both sides. He could write, he could grasp, he could make a fist with grip strength slightly diminished. On examination of the writs, no swelling or tenderness, no evidence of synovitis, no pain in the radio ulnar joint, no pain in the base of the thumb, and pronation and supination are not painful. He can fully extend his hands, and oppose the fingers.

*Id.* at 200; *see also id.* at 202.  The physician concluded that Plaintiff "has no problem in sitting, walking, or bending," but that Plaintiff does have "problems in working with his hands and carrying heavy weights because of scaphoid non-union with probable arthritis in the right wrist, and proximal scaphoid non-union of the left wrist with radio carpal arthritis," apparently based on Dr. Balcomb's findings.  *Id.* at 201  Dr. Sengupta also concluded that Plaintiff has "[a]rthritis of the left knee joint following injury with weak ACL," apparently in reference to the old motorcycle accident.  *See id.*

The Administration considered Dr. Sengupta's report and denied benefits on reconsideration on January 5, 2000, concluding that Plaintiff could perform some light work.  *See id.* at 255-56.  Plaintiff returned to work for his former employer as a welder/ironworker for three months from February 2000 to April 2000, when he quit because he could not handle the heavy lifting.  *See id.* at 56, 168, 265.

After he quit working in April 2000, Dominguez then filed a request for hearing wherein he stated that he

> hurt[s] a lot more now, I woke up with a lot of pain, sometime's I can't sleep sometime's.  My fingernail's feel like they are going to come off.  Also the tips of both hand's bother me.  My knee give's out a lot, my elbow hurt's I feel pain all the way to my shoulder.  I feel weak and I get dizzy spell's  Thin's fall from my hands.  I don't get around very well.  I can't do very much.  I either wake up hurting or I start hurting soon after moving.  I stay out of the sun because of the dizzy spell's ans much as possible.  I feel weak all the time.  Bad eye sight.

*Id.* at 161 (indicating that he worked for "two month's as a welder").  In July 2000, Plaintiff  filed another request for hearing, asserting that he "gets dizzy spell's quiet often & feel[s] weak a lot . . . bad eye sight."  *Id.* at 99.

7

ALJ Vanderhoof held his first hearing on December 1, 2000. *See id.* at 28-46. Just three days later, Plaintiff 's counsel advised the ALJ that Dominguez was withdrawing his claim because he "decided to make an attempt at working." *Id.* at 103. That notice led to the claim's dismissal on January 11, 2001, with the reconsideration determination that Plaintiff was not disabled remaining in effect. *See id.* at 17, 86, 106.

However, Plaintiff had filed new applications for benefits on January 8, 2001 (and later on June 4, 2001),[2] and a request for hearing on February 23, 2001 stating that he was "getting worse." *Id.* at 104-06. On March 22, 2001, examining consulting physician Dr. Deborah J. Schenck observed "no swelling, erythema or deformity of any of the joints of the upper or lower extremities," "full range of motion of all joints," grip strength testing showed "about 50 percent of normal grip strength on the left and about 30 percent normal grip strength on the right . . . . [A] valid test with no evidence of symptom magnification," "manipulation of the hands was normal bilaterally," and "the left knee was normal with the exception of surgical scars and mild crepitus." *Id.* at 229-30.

Dr Schenck opined that Plaintiff's conditions would restrict him to "sedentary to light work with limited lifting and gripping, and limited squatting, kneeling or ladder/stair climbing." *Id.* at 230. She further felt that as a "young intelligent man," Dominguez "would be a good candidate for vocational rehabilitation." *Id.* Her "Statement of Ability To Do Work-Related Activities" limits plaintiff to lifting or carrying five to 10 pounds frequently, handling objects due to his limited grip strength, and from kneeling, squatting, repetitive ladder/stair climbing, gripping,

---

[2] The 2001 applications are not part of the Administrative Record, but Plaintiff does not challenge those portions of the ALJ's decision that characterize the basis for his claims for benefits.

squeezing, pinching & other forceful hand activities." *Id.* at 235-36.  She found him not limited in sitting, standing, or walking.  *Id.* at 235-36; *see also* 237-44 (subsequent RFC dated April 2001 is in accord with Dr. Schenck's findings).

At some point in the Spring of 2001, Plaintiff also appealed the dismissal of his first application claiming that he "is getting worse and he apparently no longer believes that he is able to work."  *Id.* at 106.  The Appeals Council remanded finding good cause to reinstate his prior proceedings and directed that the ALJ Vanderhoof issue a new decision considering both sets of applications, which he did.  *See id.* at 17, 106-07.

After the Appeals Council remand, Dr. Baca wrote the Administration on August 20, 2001.  His letter stated that Plaintiff "is not likely to be able to perform high demand work (i.e., heavy labor)" and "will likely require surgical intervention for both wrists in order to provide pain relief and stability that may allow him to perform some sedentary work."  *Id.* at 205.  The letter does not indicate whether he had recently examined Dominguez nor does it mention when he had last seen Plaintiff.  His submitted records reflect that the last time he had seen Plaintiff was in July 1999.  In all, it appears that Dr. Baca saw Plaintiff once in October 1998, twice in December 1998, twice in June 1999 (including the surgery), and once in July for follow-up.  *See id.* at 176-81, 188-90, 209, 214, 217-21, 227-28.

On a "recent medical treatment" form dated February 13, 2002, Plaintiff reported that "Dr. Baca told me the same thing Dr. Balcom (sic) told me I would need my hand's fused together, but would not promise nothing," indicating that his last "visit" with Dr. Baca was August 20, 2001.  *Id.* at 166.  ALJ Vanderhoof also held his second evidentiary hearing on February 13, 2002.  *See id.* at 47-81.

9

### I.  Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief.  *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992).  My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency.  *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted).  "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence."  *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

### III.  Analysis

#### *A.  Credibility Finding Is Supported By Substantial Evidence*

Plaintiff bases his arguments before me solely on his wrist impairments.  One contention underlying Plaintiff's main two assertions of error is his conclusory argument that the ALJ erred in not crediting his testimony that his grip strength is diminished.  *See Docs. 9, 14.*  The record indicates that Plaintiff lives with his mother, who takes care of almost all of the household chores.  *Record* at 44, 60, 62-63.  At the first hearing Dominguez testified that he could no longer grip like he had in the past and had begun having more trouble dropping things and opening a car window.  *Id.* at 36, 42.  Dr. Sengupta reported that as of December 1999:  Plaintiff was looking for work, driving to the grocery store, and helping his mother with cleaning and cooking meals.  *Id.* at 200.  At the second hearing, Plaintiff testified that he was "having problems lifting a coffee cup, pans,"

*id.* at 57, buttoning his shirt, *id.* at 69, having "some" problems zipping his pants, *id.* at 69, dropping things more often, such as the phone, *id.* at 67-68, 72, and that his wrists "lock up/go stiff" when he pulls on his pants or boots or zips his pants, *see id.* at 58 (partly inaudible); *id.* at 68 (inaudible part clarified during examination by attorney). Dominguez also testified, however, that he can lift a light grocery bag or a gallon of milk, *id.* at 57, drive a car, *id.* at 59, shave, *id.* at 61, shower, *id.* at 62, make coffee, *id.* at 62, read the newspaper, *id.* at 62, and go out to lunch, *id.* at 63.

ALJ Vanderhoof found Plaintiff not entirely credible and concluded that Dominguez exaggerates his pain. *See id.* at 19, 22. In so finding, he reasoned as follows:

> [Plaintiff] says that he has pain in his wrists, hands and knees, aggravated by cold weather. He says his wrists lock up when he pulls on his pants or his boots. He was taking no pain medication when examined just after his alleged onset date (Exh. 6F/5 [Dr. Felter]). When he filed his new application he said that he was taking Naperlen, backquell, ibuprofen and aspirin. He complained of mental side effects from the prescribed medication, though he has not made this complaint to his doctor. Prior to the period at issue his medications were changed due to adverse side–effects (Exh. 6F/9 [Dr. Baca]). His doctor told him to consider work that was not so heavy (Exh. 6F/3 [Dr. Balcomb]). He is able to drive, shop and clean (Exh. 4F [Dr. Sengupta]). He can perform some cooking (Exh. 4F [Dr. Sengupta]). He claims to have difficulty sitting, but does not explain how his impairments limit his ability to sit. The consultative examiner thought that he had no problems with sitting (Ex. 8F [Dr. Schenck]). An orthopedic assessment, after his arthroscopic surgery, indicated that he had no problem sitting, walking or bending (Exh. 4F [Dr. Sengupta]). His doctors, the consultative examiner and the state agency doctor all think that he could perform some sedentary work (Exhs. 1F/3 [Dr. Balcomb], 5F [Dr. Baca's letter], 8F [Dr. Schenck] and 9F [2001 RFC, Drs. Yoder and Finnegan]). He claims to have difficulty with enclosed spaces, but has not received any treatment for this condition. He has not explored vocational rehabilitation.

11

*Id.* at 20.

While Plaintiff's wrist problems and diminished grip strength have lead his doctors to conclude he should not engage in heavy work, ALJ Vanderhoof's conclusion that Plaintiff exaggerates his limitations is supported by substantial evidence, most notably Plaintiff's own testimony.  Therefore, I find that the ALJ's credibility finding is supported by substantial evidence.  Moreover, as illustrated above, he closely and affirmatively linked his credibility findings to that evidence. Consequently, I defer to his credibility determination and find Plaintiff's first assertion of error without merit.  *E.g., Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995).

### B.  *Plaintiff Does Not Meet Listing § 1.02B*

Plaintiff argues that because he cannot lift or grip as well as he used to, he meets Listing §1.02B, which applies to "gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion" involving "one major peripheral joint in each upper extremity," such as wrists, "resulting in the inability to perform fine and gross movements effectively, as defined in 1.00B2c."   Inability to perform the fine and gross movements effectively is defined as "an ***extreme loss of function*** in both upper extremities, i.e., an impairment(s) that ***interferes very seriously*** with the individual's ability to independently initiate, sustain, or complete activities." Listing § 1.02B2c (emphasis added).

Specified examples of limitations that meet this criteria are "inability to prepare a simple meal and feed oneself, the inability to take care of persona hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level."  *Id.* According to Plaintiff's own testimony, he does not meet the criteria.  Therefore, I find this assignment of error without merit.

12

### *C. Hypothetical to Vocational Expert*

Consistent with Dr. Schenck's recent examination, ALJ Vanderhoof gave the vocational expert the following assumption in a hypothetical:

> lift and carry ten pounds as for musculoskeletal[,] no swelling, edema or deforming of any of the joints of the upper or lower extremities. Full range of motion of all joints. Grip strength testing showed diminished grip strength bilaterally, 50 percent normal grip strength on the left, 30 percent on the right. This was a valid test. Coordination and manipulation of the hands was normal bilaterally. Examination of the left knee was normal with the exception of surgical scars and mild crepitus. I would further limit the claimant in so far as limited squatting, kneeling and ladder or stair climbing.

*Id.* at 75-76. With those limitations, the vocational expert was of the opinion that a person could perform sedentary work such as cashiers in cafeterias, parking facilities, gift shops, change booths, where a stool is provided to either sit or stand or surveillance system monitor. *Id.* at 77. ALJ Vanderhoof further questioned the vocational expert about cashier positions and the amount of lifting involved citing a cashier who scans items as an example. *See id.* at 78-79. The vocational expert replied that the positions he identified "are usually using the hands on an occasional basis rather than a frequent [basis]." *Id.* at 79.

Plaintiff's attorney asked the vocational expert to clarify "occasional," to which the vocation expert replied that the positions "are not like cashiers at a grocery store where it's one customer after another. They may have four or five customers in a row and then they may not have any customers for several minutes. So if you wold add up all the time that they're actually using their hands, it would equal the occasional which is up to two hours and 20 minutes a day." *Id.* at 79. Plaintiff's attorney also asked the vocational expert to add to the hypothetical a person who has "trouble with manipulation as far as using the phone or similar object." *Id.*

13

Plaintiff argues that the hypothetical was incomplete, because it does not take into account Plaintiff's asserted limitations about his ability to use his hands or take into account Dr. Baca's letter which suggested surgery was necessary even before sedentary work could be considered.

It is well-settled that an ALJ is not required to accept as binding a hypothetical based on evidence unsupported by the record:

> [t]he hypothetical question should include all – and only – those impairments borne out by the evidentiary record. . . . The VE relied on the limitations found by the ALJ, which are reflected in the RFC assessment form. The ALJ was not required to accept the answer to a hypothetical question that included limitations claimed by plaintiff but not accepted by the ALJ as supported by the record. . . . We conclude the ALJ did not err in relying on the VE's testimony.

*Bean v. Chater,* 77 F.3d 1210, 1214 (10th Cir. 1995); *see also Decker v. Chater,* 86 F.3d 953, 955 (10th Cir. 1996); *Talley v. Sullivan,* 908 F.2d 585, 588 (10th Cir. 1990). The first basis for this argument is therefore without merit in light of the credibility discussion, above.

As for Dr. Baca's 2001 letter, it is apparent why the ALJ did not consider Dr. Baca's letter conclusive on Plaintiff's limitations even though the ALJ did not mention the letter in his opinion. First, the letter is equivocal, stating Plaintiff "will *likely* require surgical intervention for both wrists in order to provide pain relief and stability that *may* allow him to perform some sedentary work." *Id.* at 205. Second, it is unclear whether Dr. Baca's opinion was based on a recent examination or evaluation. Furthermore, Dr. Baca did not continue to treat Plaintiff for his wrist problems. After an initial and follow up visit, he referred Plaintiff to the Lovelace doctors specializing in such care. There, Dr. Balcomb was of the opinion that Plaintiff should engage in lighter work. Finally, Dr. Schenck was the only physician who examined Plaintiff after he quit working as a welder in 2000. I consider the ALJ's failure to discuss the letter a mere deficiency in

opinion writing and determine that a remand for that purpose alone would be an empty exercise. *See Senne v. Apfel,* 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."); *Mays v. Bowen,* 837 F. 2d 1362, 1364 (5th Cir. 1988) (same).

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 8)* is DENIED, and the decision of the Commissioner is affirmed.  A final order will enter concurrently herewith.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.